## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LYNNE C. WILLIAMS, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Case Number |
| | : | 3:17-cv-01235 (VLB) |
| | : | |
| NANCY A. BERRYHILL, ACTING | : | |
| COMMISSIONER OF SOCIAL | : | September 14, 2018 |
| SECURITY, | : | |
| Defendant. | : | |

## MEMORANDUM OF DECISION DENYING PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE COMMISSIONER (DKT. NO. 21) AND GRANTING DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER (DKT NO. 26)

This is an administrative appeal following the denial of Plaintiff Lynne C.

Williams' application for Title II Social Security Disability and Title XVI

Supplemental Security Income benefits.[1] It is brought pursuant to 42 U.S.C. §§

405(g). Plaintiff has moved for an order reversing the decision of the

Commissioner of the Social Security Administration ("Commissioner"). (Dkt. No.

21). The Commissioner opposes this motion. (Dkt. No. 26). For the following

reasons, Plaintiff's Motion for an Order Reversing the Commissioner's Decision

---

[1] Under the Social Security Act, the "Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under [the Act]." 42 U.S.C. § 405(b)(1). The Commissioner's authority to make such findings and decisions is delegated to administrative law judges (ALJs"). C.F.R. §§ 404.929 et seq. Claimants can in turn appeal an ALJ's decision to the Social Security Appeals Council. 20 C.F.R. §§ 404.967 et seq. If the appeals council declines review or affirms the ALJ opinion, the claimant may appeal to the United States District Court. Section 205(g) of the Social Security Act provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

(Dkt. No 21-2) is DENIED and Defendant's Motion for an Order Affirming the Commissioner's Decision is GRANTED.

I.     Background

     a.  Administrative Proceedings

On April 8, 2014, Plaintiff applied for disability insurance benefits and for supplemental security income. (R. 248). Plaintiff claims that her disability began on December 16, 2013, when she began experiencing back and radiating leg pain. Both applications were initially denied on August 19, 2014, and again upon reconsideration on May 6, 2015. (R. 134-141, 147-162). Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"). (R. 163-165). ALJ Ronald J. Thomas heard the case on November 21, 2016. (R. 33-35). ALJ Thomas issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. 10). The Appeals Council denied Plaintiff's request for review; this action followed. (R. 1-4).

     b.  Medical History/Chronology

Plaintiff was under the care of Dr. Richard R. Slater until December 23, 2010. (R. 649). Dr. Slater withdrew from treating Plaintiff because he believed that Plaintiff was seeking controlled substances. (R. 648-649).

On September 22, 2011, Plaintiff saw nephrologists Anushree Shirali, M.D. and Deepak Kadiyala, M.D for evaluation. (R. 405). Their treatment notes described Plaintiff as a 53-year-old female with a ten-year history of hypertension, hyperlipidemia, remote CVA, obesity[2] and chronic back pain. (R. 405). Plaintiff

_____

[2] The doctor recorded that Plaintiff's weight was 190 pounds. (R. 405).

told Drs. Shirali and Kadiyala that she was formerly an x-ray technician "but stopped due to back pain" (R. 406). Plaintiff had been taking Percocet and Valium for several months preceding her appointment but switched to meloxicam and Motrin shortly before her appointment. Plaintiff stated that her hypertension was a side effect of the meloxicam and that she would prefer to take Percocet. (R. 406). Dr. Kadiyala diagnosed Plaintiff with Chronic Kidney Disease and suggested a Liboderm patch instead of non-steroidal anti-inflammatory drugs ("NSAIDs") like meloxicam and Motrin. (R. 406).

Plaintiff presented to the Emergency Room at Yale New Haven Hospital ("Yale"), on February 19, 2013, following a fall on the ice. (R. 403-405). Plaintiff complained of left ankle pain and swelling. (R. 403). An x-ray confirmed an avulsion fracture to the left ankle. (R. 405). Plaintiff received Tylenol for pain. (R. 405).

Months later, in May 2013, Plaintiff saw a physician at the General Practitioners of Hamden and asked for a note allowing her to "return to work at full capacity." (R. 647). While there, she complained of prolonged back pain and requested something to aid sleep. The doctor she saw prescribed Diazepam. (R. 647).

On December 16, 2013, Dr. Pichamol Jirapinyo treated Plaintiff at Yale's Primary Care Center for back pain. (R. 401-403). The doctor recorded Plaintiff's height and weight as 5'7" and 193 pounds giving Plaintiff a BMI of 30.25 kg/m2. (R. 402). Plaintiff complained that her back pain had been occurring for approximately 15 years. She described the pain as sharp, constant, and getting

increasingly worse. Plaintiff also experienced numbness and tingling in her legs. (R. 401). She stated the pain affected her daily activity and interrupted with her sleep. (R. 401). Additionally, Plaintiff indicated that she had tried multiple medications as well as several weeks of physical therapy with no improvement. (R. 401). She refused to accept a physical therapy referral. (R. 401). Thus, Dr. Jirapinyo prescribed Tramadol, an opioid pain medication. (R. 402). The Plaintiff stated that morphine, which she received from a friend, provided the only relief. (R. 401). Plaintiff requested morphine, but the doctor refused because alternative options were not yet maximized. (R. 401).

Following the doctor's refusal to prescribe morphine, Plaintiff returned to Yale's Primary Care Center on January 23, 2014. (R. 524-525). During this visit, Plaintiff denied the scheduled blood work and threw lab slips at the nurse. (R. 524). Plaintiff then pushed her son who was defending the nurse. Security was called to escort Plaintiff out of the office. (R. 524).

Plaintiff next appeared at Yale in the Emergency Room on March 4, 2014 reporting suicidal ideation. (R. 516-524). She admitted to spending her state benefits check on card games and alcohol. (R. 517). She stated that she drank vodka from the bottle for two days before arriving at the hospital. (R. 517). Plaintiff also admitted to feeling bad about herself for several months because she was unemployed and had a poor relationship with her father. (R. 517). Plaintiff was willing to undergo alcohol treatment. (R. 522). Her Global Assessment of Functioning Score (GAF Score), which assesses the effect of

psychiatric illness on a person's functional skills and abilities, was 51 out of 100. (R. 522).

Three weeks later, on March 28, 2014, Plaintiff returned to the Primary Care Center. (R. 389-392). Dr. Jirapinyo met with Plaintiff. Plaintiff informed the doctor that her pain was still constant. (R. 390). Dr. Jirapinyo noted that Plaintiff was in the obese range based on a recorded height of 5'6" and weight of 191 pounds. (R. 390). The doctor noted Plaintiff's BMI to be 30.88 kg/m2. (R. 390). The doctor was not certain whether spinal stenosis or osteoarthritis caused the Plaintiff's back pain. (R. 391). The doctor ordered an MRI to evaluate Plaintiff's back. (R. 391).

The MRI took place on April 22, 2014, and showed multiple bulging discs, some with stenosis and contact with nerve roots. (R. 369). Plaintiff saw Dr. Perdigoto to review the MRI. (R. 385). Dr. Perdigoto stated the pain was likely degenerative disease and that Plaintiff had epidural lipomatosis, which was possibly correlated with her obesity. (R. 386). Plaintiff stated that she was having difficulty working because she was unable to stand or sit for prolonged periods of time due to her pain. (R. 385). The epidural lipomatosis can lead to progressive neurological deficits, so Dr. Perdigoto referred Plaintiff to orthopedics. (R. 386). The doctor increased the Tramadol prescription from 50mg to 100mg. (R. 386). Dr. Perdigoto issued a letter following the visit stating that Plaintiff has a degenerative disc disease and epidural lipomatosis, rendering her unable to work. (R. 370).

On May 24, 2014, just one month after the MRI, an ambulance escorted Plaintiff to the Yale New Haven Emergency Room. (R. 430-439). The ambulance

arrived after Plaintiff woke up naked, in complete disarray. Plaintiff's son indicated that she was extremely intoxicated the night before. (R. 431). The report showed Plaintiff was drinking two pints of vodka per day, three days per week, and using crack cocaine. (R. 435). The Plaintiff also admitted to taking "handfuls" of the prescribed Tramadol. (R. 431). Plaintiff refused detoxification. She left the hospital upon being clinically sober. (R. 432).

Plaintiff returned to Yale on May 30, 2014 after making suicidal comments. (R. 471-478). The report stated that Plaintiff "had been drinking earlier, got into an altercation wither her husband, and made comments about 'blowing her brains out.'" (R. 473). Additionally, Plaintiff was "belligerent, combative and yelling at staff." (R. 473). Plaintiff ultimately denied suicidal plans and staff decided she was non-suicidal. (R. 475).

On August 13, 2014, Plaintiff presented to Yale Primary Care Center for "pain uncontrolled on current regiment" and refills of her anti-hypertensives and cholesterol medications. (R. 552-555). The report indicated Plaintiff had been using double the prescribed amount of Tramadol and was in need of more medication. (R. 552). Additionally, Plaintiff stated that no medication eased her pain except morphine. The supervising physician added to the report that Plaintiff refused to discuss any type of therapy or medication besides narcotic treatment. (R. 554). The supervising physician declined to prescribe morphine. (R. 522).

Plaintiff returned to Primary Care Center on October 8, 2014 with lumbar pain. (R. 555-559). Dr. Alison Romegialli assessed Plaintiff. (R. 555). Plaintiff indicated that the pain was better when she leaned forward, but that she laid flat

the majority of the time. (R. 556). Additionally, Plaintiff showed significant weight gain over the past few years due to inactivity and reported an inability to perform household chores. (R. 556). The doctor indicated lower lumbar tenderness and a limited range of motion, but no neurological deficits. (R. 557). Furthermore, the doctor referred Plaintiff to a pain specialist and a neurologist. (R. 559).

On January 12, 2015, Dr. Kolene McDade assessed Plaintiff at the Primary Care Center. (R. 570-573). The examination affirmed the continued back pain as well as a gait problem. (R. 571). The doctor stated that Plaintiff's description of her pain was out of proportion to the MRI results. (R. 572).

Plaintiff's next visit to Primary Care occurred on August 26, 2015, where she saw Dr. Mohsin Chowdhury for "worsening back pain" and a renewal of Tramadol. (R. 657-666). The report showed that Plaintiff had canceled the appointments for neurology and pain management that were previously scheduled at Dr. Romegialli's suggestion. (R. 657). Plaintiff also refused to try aquatherapy, stating she was afraid of water. (R. 657). The doctor renewed the Tramadol prescription. (R. 660).

On March 29, 2016, Dr. Robert Morrison of the Connecticut Heart Group, PC evaluated Plaintiff for a cardiovascular consultation after an abnormal EKG. (R. 885-886). Plaintiff's height, weight and BMI were 5'6", 213 pounds, and 34.38 kg/m2 respectively. (R. 885). The doctor ordered a stress test and an echocardiogram. (R. 885). Additionally, Dr. Morrison instructed Plaintiff to discontinue tobacco use. (R. 885).

Plaintiff returned to the Emergency Room at Yale on April 3, 2016, reporting back pain and abdominal pain. (R. 737-741). The doctor gave Plaintiff a Licodaine patch and she returned home after her symptoms improved. (R. 741). Plaintiff came back to the Emergency Room on April 12, 2016. (R. 742-746). Plaintiff stated she suffered from the same back pain for years that her pain was not changing. (R. 742).

On May 2, 2016, Plaintiff saw Dr. Romegialli at the Primary Care Center for follow-up. (R. 677-680). Plaintiff specified that she needed narcotics for her back pain. (R. 680). When Dr. Romegialli attempted to counsel Plaintiff on the best remedies, Plaintiff interrupted and asked if the doctor would prescribe her opioids. (R. 680). When the doctor refused to prescribe narcotics, Plaintiff left the office. (R. 680).

Plaintiff had an abnormal echocardiogram at the Connecticut Heart Group office on May 18, 2016. (R. 890-892). A stress test occurred on June 17, 2016. (R. 889). The Plaintiff's shortness of breath caused the test to end after two minutes. (R. 889). The doctor noted that Plaintiff was at immediate risk for a cardiovascular event due to her performance on the stress test. (R. 889).

A left heart catheterization and coronary angiography occurred at Yale, on July 18, 2016. (R. 887-888). A surgical consultation for a coronary artery bypass graft with Dr. Viswa Nathan took place on July 21, 2016. (R. 895-897). The catheterization revealed triple coronary artery disease and Dr. Nathan suggested coronary artery bypass x 3 to be done the following day. (R. 895-896). Following the bypass surgery, Plaintiff remained in the hospital until July 27, 2016. (R. 780-

784). After being discharged, Dr. Joseph Gallego noted that Plaintiff returned home and drank half a pint of vodka. (R. 814-815).

The next day, Plaintiff attempted to appear at the hearing before ALJ Thomas but had a syncopal episode in the lobby and an ambulance transported her to Yale. (R. 804-833). Plaintiff remained hospitalized until August 1, 2016 due to evolving pneumonia. (R. 826). Antibiotics were prescribed. (R. 809). During her stay, Plaintiff discussed with Dr. Jonathan Siegfried her ideation that the hospital was keeping her only for the institution's and employees' financial benefit. (R. 813).

Plaintiff saw Dr. Chowdhury at the Primary Care Center to follow-up on August 12, 2016. (R. 879-882). Plaintiff stated her dissatisfaction with some of the doctors that have evaluated her, then began complimenting others as the "best doctors" she has ever had. (R. 879). Dr. Chowdhury, concerned by her split behavior, suggested a mental health evaluation. Plaintiff refused. (R. 879). The doctor also noted that her exercise tolerance was improving. (R. 879).

Dr. Nathan evaluated Plaintiff on August 23, 2016. (R. 899-901). The doctor indicated Plaintiff's height, weight and BMI were 5'5", 218 pounds, and 36.28 respectively. (R. 900). Dr. Nathan strongly advised Plaintiff to be on a strict diet. (R. 900). On a follow-up dated October 11, 2016, Dr. Nathan saw Plaintiff again. At this visit, Plaintiff weighted 208 pounds and her BMI dropped to 34.78. Dr. Nathan advised Plaintiff to "lose a few more pounds." (R. 914-915).

Plaintiff returned to the Primary Care Center on November 9, 2016 to discuss back pain with Dr. Graham Taylor. (R. 916-919). Plaintiff's weight

remained at 208 pounds. (R. 917). The doctor discussed with Plaintiff his reasons for not prescribing her an opioid. (R. 916). Plaintiff refused all other suggested treatments. (R. 916). On or around November 14, 2016, Plaintiff had a second lumbar MRI. (R. 910). There was no significant change when compared to the original MRI. (R. 907). Plaintiff then went to Yale on December 6, 2016 and explained that narcotics remained the only medication that could relieve her pain. (R. 919-23). Physician's Assistant, Adam Riso, clarified that he would not prescribe pain medication for back pain but would refer Plaintiff to physical therapy. (R. 923).

### c. The ALJ's decision

At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since December 16, 2013, the alleged onset date. (R. 12). At step two, the ALJ found that Plaintiff has the following severe impairments: degenerative disc disease of the lumbar spine; hypertension with coronary artery disease; and obesity. (R. 12). The ALJ held these impairments "significantly limit the claimant's ability to perform basic work activities." (R. 12). Additionally, the ALJ found Plaintiff's cataract, affective disorder, and alcohol abuse non-severe, as they only amount to a "combination of slight abnormalities that would have had no more than a minimal effect on the claimant's ability to meet the basic demands of work activity." (R. 12). Further, the ALJ found Plaintiff did not have a severe mental impairment according to the four broad functional areas explained in the disability regulations for evaluating mental disorders. (R. 12).

At step three the ALJ found the claimant not to have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (R. 14). Specifically, the ALJ considered Plaintiff's degenerative disc disease under Listing 1.04 but concluded that Plaintiff's condition does not demonstrate the requisite neurological deficits. (R. 15). Additionally, the ALJ found Plaintiff's hypertension and coronary artery disease did not satisfy any cardiac impairment in Listing 4.00. (R. 15). The ALJ also specified that obesity is viewed in combination with listed impairments as a factor, not as a separate impairment. (R. 15). While Plaintiff most recently weighed 208 pounds, (R. 917), the evidence did not establish that the additional impact of Plaintiff's excess weight caused any relevant listing to be met or medically equaled. (R. 15).

At step four, the ALJ found that Plaintiff has the residual functional capacity to perform light work as well as "occasional bending, balancing, crawling, twisting, squatting, kneeling, and climbing with no climbing of ropes, ladders or scaffolds." (R. 15). Specifically, the ALJ pointed out that Plaintiff is able to drive, cook meals for her family, wash dishes, and use public transportation. (R. 15, 18).

When assessing the residual functional capacity, the ALJ must follow a two-step process. (R. 15). First, it must be determined whether there is "an underlying medically determinable physical or mental impairment . . . that could reasonably be expected to yield Plaintiff's pain or other symptoms." (R. 15). Second, the ALJ must evaluate the "intensity, persistence, or functionally limiting

effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations." (R. 15).

After considering the evidence, the ALJ found Plaintiff's medically determinable impairments could reasonably be expected to cause Plaintiff's back pain. (R. 16). In step two of the analysis, the ALJ found Plaintiff's statements concerning the degree of the symptoms not entirely consistent with the medical evidence and other evidence of the record. (R. 16). This finding was consistent with that of her treating physician who stated that Plaintiff's description of her pain was out of proportion to the MRI results. (R. 572).    In this examination, the ALJ gave substantial weight to Plaintiff's repeated refusal of physical therapy, pain management, and neurology treatment. (R. 17). The ALJ also gave great weight to the initial assessments, which support a finding of light residual functional capacity. (R. 18). While Plaintiff described limited daily activities, the ALJ stated that the daily activities could not be "objectively verified with any reasonable degree of certainty." (R. 18). The ALJ assigned Plaintiff's GAF score of 51 minimal weight due to the absence of consideration for "specific work-related limitations or objective mental abnormalities." (R. 14).  The ALJ indicated the GAF scale is an "inappropriate" tool for assessing legal disability. (R. 14). The ALJ also gave slight weight to both notes from Dr. Perdigoto and Dr. McDade indicating Plaintiff's inability to work. (R. 19). The ALJ specified that deciding whether or not a person can work is not a medical opinion, but rather an "administrative finding dispositive of a case." (R. 19). Ultimately, the ALJ found the claimant would be able to perform different types of work at the light

exertional level with some "non-exertional limitations" specified in the residual functional capacity. (R. 19).

At step five, the ALJ found Plaintiff capable of performing past relevant work as a radiology technician because the work does not require the precluded activities listed in the claimant's residual functional capacity. (R. 19). The ALJ gave great weight to the vocational expert who testified that the occupation of radiology technician is a "light job." (R. 19). Because of the corroboration of the vocational expert testimony and Plaintiff's residual functional capacity, the ALJ found Plaintiff to be capable of performing past relevant work. (R. 20). As a result of the five-step evaluation, the ALJ found that Plaintiff was not disabled as defined in the Social Security Act. (R. 20).

## II.    Legal Standard

The Social Security Act establishes that benefits are payable to individuals who have a disability. 42 U.S.C. § 423(a)(1). "The term 'disability' means . . . an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1). A person must be disabled within the meaning of the Social Security Act and not any other law or regulation. A Social Security disability determination based on other laws or regulations is not dispositive of whether a person is disabled under the Social Security Act. 20 C.F.R. §§ 404.1504, 416.904. That section provides that "a determination made by another agency that you are disabled . . . is not binding on the Social Security Administration." *See also Musgrave v. Sullivan,* 966 F.2d 1371, 1375 (10th Cir. 1992) (ALJ did not err by not giving more weight to VA finding that

claimant was 20% disabled). The position has been reinforced by the amendment to the regulation which now states that "on or after March 27, 2017, we will not provide any analysis in our determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits." 20 C.F.R. §§ 404.1504; 416.904. Thus, the weight given to the opinion of an expert who is familiar with the Social Security Act program is entitled to greater weight than the opinion of an expert who is unfamiliar with the program.

In order to determine whether a claimant is disabled within the meaning of the Social Security Act, the ALJ must follow a five-step evaluation process promulgated by the commissioner.[3] A person is disabled under the Act when their impairment is "of such severity that she is not only unable to do her previous work but cannot . . . engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). "Work which exists in the national economy means work which exists in significant

---

[3] The five steps are as follows: (1) The Commissioner considers whether the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities; (3) if the claimant has a "severe impairment," the Commissioner must ask whether, based solely on the medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience; (4) if the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has the residual functional capacity to perform his or her past work; and (5) if the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden on the first four steps. 20 C.F.R. §416.920(a)(4)(i)-(v).

numbers either in the region where such individual lives or in several regions of the country." *Id.*[4]

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842 (2d Cir. 1981). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, [are] conclusive." 42 U.S.C. § 405(g). Accordingly, the Court may not make a de novo determination of whether a plaintiff is disabled in reviewing a denial of disability benefits. *Id.*; *Wagner v. Sec'y of Health & Human Servs.,* 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Court's function is to ascertain whether the Commissioner applied the correct legal principles in reaching his conclusion, and whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). Therefore, absent legal error, this Court may not set aside the decision of the Commissioner if it is supported by substantial evidence. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). If the Commissioner's decision is supported by substantial evidence, that decision will be sustained, even where there may also be substantial evidence to support the plaintiff's contrary position. *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982).

The Second Circuit has defined substantive evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a

---

[4] The determination of whether such work exists in the national economy is made without regard to: 1) "whether such work exists in the immediate area in which [the claimant] lives;" 2) "whether a specific job vacancy exists for [the claimant];" or 3) "whether [the claimant] would be hired if he applied for work." Id.

conclusion." ***Williams v. Bowen***, 859 F.2d 255, 258 (2d Cir. 1988) (quoting ***Richardson v. Perales***, 402 U.S. 389, 401 (1971)). Substantial evidence must be "more than a scintilla or touch of proof here and there in the record." ***Williams***, 859 F.2d at 258.

## III.    Discussion

Plaintiff moves for reversal or remand of the ALJ's decision on four grounds, asserting the ALJ (1) failed to develop the record, (2) failed to perform an effective analysis of the listed impairments, (3) failed to properly evaluate Plaintiff's obesity, and (4) failed to sufficiently evaluate Plaintiff's pain and mental impairment.

### a.  The ALJ Properly Developed the Record

The Plaintiff asserts the ALJ did not sufficiently develop the record. Specifically, that "with the exception of the document appearing at R. 564-567, nothing that could be deemed a medical source statement ("MSS") appears in the Record from any treating physician or clinician." (Dkt. No. 21-1 at 1). Plaintiff states that the presence of one MSS from Dr. McDade does not indicate a fully developed record due to a lack of medical records from additional treating physicians indicating the Plaintiff's functional limitations on a "function-by-function basis." *Id.* at 6.

The Commissioner responds that Dr. McDade's MSS, combined with a substantial amount of other medical evidence weighed by the ALJ, formed an adequately developed record. (Dkt. No. 26 at 13). The Commissioner contends that Dr. McDade's MSS indicated "Plaintiff's ability to stand, stating that she

could do so for 3-5 minutes at a time, which speaks directly to RFC." *Id.* at 14

(citing R. at 565). In the MSS, Dr. McDade answered the question, "is this person

capable of simple, competitive employment at this time. If no, please describe

his/her current symptoms and limitations." (R. 564). The Commissioner argues

that Dr. McDade's report indicated Plaintiff's ability to stand, sit, drive, and do

housework. (Dkt. 26 at 14). Therefore, the Agency's request for the

comprehensive assessment satisfies the Commissioner's duty to seek the

records. (Dkt. 26 at 14).

Because a social security disability hearing is non-adversarial, the ALJ

bears responsibility for ensuring that an adequate record is developed. *See*

*Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009*); Casin-Ortiz v.*

*Astrue*, 2007 WL 2745704, at \*7 (S.D.N.Y. Sept. 21, 2007) (citing *Perez v. Chater*, 77

F.3d 41, 47 (2d Cir. 1996)). The ALJ must make "every reasonable effort" to help

an applicant obtain medical reports from his medical sources. 20 C.F.R. §§

404.1512(d), 416.912(d). "The record as a whole must be complete and detailed

enough to allow the ALJ to determine the claimant's residual functional

capacity." 20 C.F.R. § 404.1513(e)(1)-(3)). Where there are suggestions in the

record that additional, available information would have been helpful to the ALJ's

determination, the ALJ must attempt to fill the gaps in the record before

discrediting the opinion. *Austin v. Astrue*, 2010 WL 7865079, \*9–10 (D. Conn. Sept.

30, 2010) (citing *Perez*, 77 F.3d at 47).

"When an unsuccessful claimant files a civil action on the ground of

inadequate development of the record, the issue is whether the missing evidence

is significant." *Santiago v. Astrue*, 2011 WL 4460206, at *2 (D. Conn. Sept. 27, 2011) (citing *Pratts v. Chater*, 94 F.3d 34, 37–38 (2d Cir. 1996)). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 129 S. Ct. 1696, 1706 (2009).

Plaintiff cites several cases in support of her argument that the record was not adequately developed. In each of these cases, the records lacked both medical source statements from treating physicians and substantial evidence from which the ALJ could assess the claimant's residual functioning capacity.[5] Here, however, the record contains an MSS from a treating physician and other substantial evidence from which the ALJ assessed Plaintiff's residual functional capacity.

In this case, the ALJ took sufficient steps to fully develop the record by securing a comprehensive analysis by Dr. McDade. (R. 560-67). Dr. McDade evaluated the Plaintiff for her ongoing back pain on January 12, 2015. (R. 570). In the medical statement given to the agency, Dr. McDade described Plaintiff's limitations including an inability to lift, bend, reach, and a decreased ability to stand for prolonged periods and perform daily activities. (R. 565). The Agency requested an assessment indicating the Plaintiff's specific limitations on basic functions. While Plaintiff contends that Dr. McDade's report did not

---

[5] *See, e.g.*, *Guillen v. Berryhill*, 2017 WL 4279335 (2d Cir. Sept. 27, 2017) (Summary Order) (cited at Dkt. 21-2 at 7-8) (ALJ failed to fully develop the record because there were no medical records from treating physicians that indicated the impact of the plaintiff's impairment on everyday activity); *Blackert v. Berryhill*, Civil No. 3:16-cv-1327 (JCH), *Ruling*, (D. Conn. Jul. 25, 2017) at 10-11 (State agency medical consultants and ALJ noted that the record did not contain an expert opinion from a treating physician about the Plaintiff's ability to work).

"meaningful[ly] address her actual functional limitations," it is sufficient to satisfy the requirement clarified in 20 C.F.R. § 404.1513(a)(2) stating that "a medical opinion is a statement from a medical source about what you can still do despite your impairment(s)." Dr. McDade clearly indicated the Plaintiff's limitations including the inability to stand for a period longer than 3-5 minutes, and a decreased ability to perform "house cleaning, dishes, etc." (R. 565).

Dr. McDade's findings regarding Plaintiff's functional limitations are corroborated by Dr. Franklin-Zitzkat's summary. (R. 639-642). Dr. Franklin-Zitzkat consultatively examined the Plaintiff at the request of the State Agency. Dr. Franklin-Zitzkat found that Plaintiff's limitations included standing for long periods, many household chores, sitting for long periods, bending, lifting, and exercising. (R. 641). Additionally, Dr. Franklin-Zitzkat found Plaintiff was able to cook, wash dishes, perform personal care tasks, occasionally push a shopping carriage while walking through a grocery store, and drive. (R. 641). The impairments and abilities Dr. Franklin-Zitzkat noted directly validate Dr. McDade's MSS. Therefore, the ALJ had a sufficiently comprehensive record to determine Plaintiff's residual functional capacity. Plaintiff's argument that Dr. McDade's report is not a sufficient statement of Plaintiff's functional limitations is without merit because Dr. McDade's report is not the only independent source of Plaintiff's limitations.

b. The ALJ's Listed Impairment Analysis

The Plaintiff next contends that the ALJ's step three listed impairments analysis is defective. Specifically, Plaintiff argues there is "no analysis of the fit

between the specific requirements of the Listings and Plaintiff's documented conditions." (Dkt. No. 21-2 at 12).

The Commissioner asserts that there is substantial evidence supporting the ALJ's finding that "Plaintiff was not *per se* disabled under any of the listings found in 20 C.F.R. 404, Subpart P, Appendix 1." (Dkt. No. 26 at 4) (Citing R. 14-15).

"For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). The plaintiff bears the burden of producing medical evidence establishing that she meets the requirements of a listed impairment. *Id.* In determining whether a listing has been met or equaled under step three, the ALJ must consider "all relevant evidence in the case record." 20 C.F.R. § 404.1525 app. 1, Listing 12.00(D) (2015). The ALJ is required to articulate specific reasons justifying his decision that the claimant does or does not meet the relevant listing. *See Daniels v. Berryhill*, No. 3:16CV01181 (SALM), 2017 WL 2798500, at *7 (D. Conn. June 28, 2017). "Although . . . an ALJ should set forth a sufficient rationale in support of his decision to find or not to find a listed impairment, the absence of an express rationale for an ALJ's conclusions does not prevent [the Court] from upholding them so long as [the Court is] able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence." *Salmini v. Comm'r of Soc. Sec.*, 371 Fed. Appx. 109, 112 (2d Cir. 2010).

The ALJ pointed out the following relevant Listings: Listing 1.04 (Disorders of the Spine), for her degenerative disc disease, and Listing 4.00 (the various Cardiac Listings), for her coronary artery disease. (R. 14-15).

Listing 1.04 requires:

1.04 *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

OR

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

OR

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.[6]

To meet Listing 1.04, Plaintiff would need to show the requisite neurological deficits. 20 C.F.R. § 404, Subpart P, Appendix 1, Listings § 1.04(A), (C). There were no findings of neurological deficits. Specifically, Dr. Lammers, a state agency consulting physician, found Plaintiff did not satisfy Listing 1.04 due to an absence of lower extremity weakness, a type of neurological deficit. (R. 128). Additionally, treating physicians Drs. Jirapinyo, Bogan, McDade, Perdigoto, Chowdhury, and P.A. Riso all noted on medical visits that Plaintiff was negative

---

[6] 20 C.F.R. § 404, Subpart P, Appendix 1, Listings § 1.04(A).

for lower extremity weakness. (R. 389, 742, 570, 385, 657, and 919). This

constitutes substantial evidence in support of the ALJ's conclusion that Plaintiff

did not meet Listing 1.04.

Listing 4.04 requires in pertinent part:

**C. Coronary artery disease, demonstrated by angiography (obtained independent of Social Security disability evaluation) or other appropriate medically acceptable imaging, and in the absence of a timely exercise tolerance test or a timely normal drug-induced stress test, an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that performance of exercise tolerance testing would present a significant risk to the individual, with both 1 and 2:**

**1. Angiographic evidence showing:**

**a. 50 percent or more narrowing of a nonbypassed left main coronary artery; or**

**b. 70 percent or more narrowing of another nonbypassed coronary artery; or**

**c. 50 percent or more narrowing involving a long (greater than 1 cm) segment of a nonbypassed coronary artery; or**

**d. 50 percent or more narrowing of at least two nonbypassed coronary arteries; or**

**e. 70 percent or more narrowing of a bypass graft vessel; and**

**2. Resulting in very serious limitations in the ability to independently initiate, sustain, or complete activities of daily living.[7]**

In explaining why he concluded the claimant's hypertension or coronary

artery disease do not satisfy any cardiac listing under Listing 4.00. (R. 15).

Instead, The ALJ noted an absence of objective findings, stating "no treating of

examining physician has indicated findings that would satisfy the severity

requirements of any listed impairments." (R. 14). Substantial evidence in the

---

[7] **20 C.F.R. § 404, Subpart P, Appendix 1, Listings § 4.04(C)**

record supports the ALJ's conclusion. Specifically, state agency consulting physicians Drs. Lammers and O'Neill concluded Plaintiff did not satisfy or meet any Listing after performing a thorough review of Plaintiff's medical records. (R. 128). Such "[s]tate agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." SSR 96-6p, 1996 WL 374180, *1.

In order for Plaintiff to satisfy a Listing under 4.00, she would have to show that "unless [the] impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least twelve months." 20 C.F.R. § 404.1509. Substantial evidence in the record demonstrates that this time requirement is not met here. For example, on August 30, 2016, Dr. Nathan predicted Plaintiff would make a full recovery in two weeks from her artery bypass surgery. (R. 913). Furthermore, Dr. Nathan stated in Plaintiff's progress note dated October 7, 2016 that "her shortness of breath, incisional pain and weakness [have] improved. Today in the office she looks and feels much better. Her incisional pain and shortness of breath have resolved." (R. 914). Dr. Nathan's progress note constitutes substantial evidence corroborating Dr. Lammers' finding that Plaintiff did not satisfy or equal and Listings under 4.00, as well as the ALJ's decision, because Plaintiff cannot meet the duration requirement.

Of note, Plaintiff did not point out any additional Listings that would apply. The reports from Drs. Lammers and O'Neill stating Plaintiff does not meet any listings in combination with all medical evidence not indicating the severity

requirements of any listing are met provide an ample basis for the ALJ to determine the Plaintiff does not meet any listings.

### c. The ALJ Properly Evaluated Plaintiff's Obesity

The Plaintiff next contends that the ALJ did not assign Plaintiff's obesity enough weight as a factor to consider a listing met or equaled. (Dkt. 21-2 at 13). Specifically, Plaintiff argues the ALJ is required to examine all of Plaintiff's many problems together. Plaintiff alleges that the combined effects of obesity with other impairments can be greater than the effects of each impairment considered separately. (Dkt. 21-2 at 13).

The Commissioner responds that the ALJ acknowledged Plaintiff's weight and body mass index ("BMI") and points out that ALJ and the State Agency doctors were aware of Plaintiff's obesity when determining that she did not meet or equal any Listings. (Dkt. 26 at 12).

"The ALJ is required to consider the effects of obesity in combination with other impairments throughout the five-step evaluation process. At step three, obesity can rise to the level of a disabling impairment under certain circumstances—generally speaking, when it increases the severity of coexisting impairments, particularly those affecting the musculoskeletal, cardiovascular and respiratory systems." *Crossman v. Astrue*, 783 F. Supp. 2d 300, 309-10 (D. Conn. 2010). The Social Security Policy Interpretations for the Evaluation of Obesity state that "because there is no listing for obesity, we will find that an individual with obesity 'meets' the requirements of a listing if he or she has another impairment that, by itself, meets the requirements of a listing. We will also find

that a listing is met if there is an impairment that, in combination with obesity, meets the requirements of a listing." SSR 02-1p, Evaluation of Obesity.

In this case, the ALJ reiterates that "obesity is no longer considered a separate impairment, but rather is viewed in combination with listed impairments as a factor, which could cause a listing to be met or equaled when it would not otherwise be the case." (R. 15). The ALJ acknowledged that Plaintiff was obese, weighing 209 pounds and having a BMI of 34.78. (R. 15). ALJ concluded that "the evidence fails to establish that the additional impact of the claimant's excess weight would cause any relevant listings to be met or equaled." (R. 14). The ALJ performed an adequate analysis by evaluating the Plaintiff's obesity in conjunction with her back pain and heart issues to determine if any Listings were met or equaled. The ALJ therefore properly concluded the Plaintiff has not met or equaled a Listing.

### d. The ALJ's Evaluation of Plaintiff's Pain was Adequate

Plaintiff next argues that the ALJ did not give sufficient weight to the Plaintiff's subjective pain testimony. Particularly, Plaintiff asserts that the ALJ "discounted [Plaintiff's pain] to insignificance." (Dkt. 21-2 at 15). The Commissioner counters that the ALJ may use discretion in weighing the credibility of the Plaintiff's subjective pain testimony with all other evidence on the record. (Dkt. 26 at 7).

"Pain is an important factor to consider when determining disability." *Hammock v. Bowen*, 867 F.2d 1209, 1213 (9th Cir. 1989). "When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and

other limitations into account." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). However, the ALJ "is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Id.* "In light of substantial evidence in the record supporting the ALJ's credibility determination, the court may not second-guess his decision. This applies with particular force in light of the special deference owed to the credibility determinations of an ALJ who had the opportunity to observe plaintiff's demeanor while testifying." *Marquez v. Colvin*, No. 12 CIV. 6819 PKC, 2013 WL 5568718, at *16 (S.D.N.Y. Oct. 9, 2013) (citing *Yellow Freight Sys. Inc. v. Reich*, 38 F. 3d 76, 81 (2d Cir. 1994).

The ALJ considered the Plaintiff's subjective pain testimony and found that the limited daily activities the Plaintiff described could not be "objectively verified with any reasonable degree of certainty." (R. 18). The ALJ went on to state that in addition, "even if claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons." (R. 18). The ALJ determined that Plaintiff's repeated descriptions on the record of all the daily activities she still performs are "contrary to the allegation of a greater level of ongoing functional limitations." (R.18). For example, while Plaintiff claims that her pain prevents her from doing any form of work, Plaintiff stated multiple times she is still able to cook, wash dishes, shower, and drive. (R. 314, 640).

The ALJ also considered that Dr. McDade indicated that Plaintiff's pain allegations were disproportionate to her MRI results. (R. 572). Furthermore, the

ALJ considered medical evidence which showed that Plaintiff's pain was effectively controlled by medication. (R. 18). The ALJ specifically noted that Plaintiff refused the physical therapy and pain management suggested by multiple physicians. (R.17). In addition, the ALJ pointed out evidence of Plaintiff's misuse of Tramadol as a possible alternative explanation to the Plaintiff's pain testimony not matching the MRI and frequent normal test results. (R. 16-17). Various courts have held that "[a] claimant's misuse of medications is a valid factor in an ALJ's credibility determinations." *Pidkaminy v. Astrue*, 919 F. Supp. 2d 237, 250 (2d Cir. 2013). Because the ALJ took Plaintiff's subjective pain testimony into consideration with specific, additional medical evidence, the analysis is adequate.

### e. The ALJ's Vocational Analysis is Adequate

The ALJ found that the Plaintiff's impairments do not affect her capacity so much that she is prevented from performing her past relevant work as a radiology technician. (R. 20). Plaintiff argues that the ALJ's vocational analysis is unsupported. Specifically, Plaintiff asserts that the ALJ's hypothetical is irrelevant because the suggested activities in the hypothetical have "no basis in the Record." (Dkt. 21-2 at 23). The Commissioner argues that there is substantial evidence to support the ALJ's finding that "given the RFC, Plaintiff could perform her past relevant work as a radiology technician." (Dkt. 26 at 14 (citing R. 19-20)).

"The basic purpose of vocational expert testimony is to determine whether jobs exist for someone with claimant's precise disabilities." *Jelinek v. Bowen*, 870 F.2d 457, 459 (8th Cir. 1989). "A vocational expert's testimony is substantial if

premised on a well-supported RFC." *Dumas v. Schweiker*, 712 F.2d 1545 (2d Cir. 1983).

The ALJ asked the vocational expert to assume a person "with the same age, education, and work experience as the claimant, and a residual functional capacity," and to determine whether such a person could perform the duties of a radiology technician. (R. 20). The Dictionary of Occupational Titles ("DOT") describes the job of "radiology technician" as a "light job." (R. 19). A "light job" requires occasional lifting of up to twenty pounds, regular lifting of objects up to ten pounds, standing, sitting, pushing or pulling of arm or leg controls, and walking. 20 C.F.R. § 404.1567(b). The vocational expert testified that an individual with Plaintiff's age, education, work experience, and RFC would be able to perform work at a light exertional level, as defined by the DOT. (Tr. 51).

The ALJ then asked the vocational expert to consider someone of Plaintiff's age, education, and past relevant work experience "who is limited to the light exertional level as defined in the Regulations; and has the further restrictions of the need for only occasional bending and balancing, crawling and twisting squatting, kneeling and climbing, but no climbing of ladders, ropes, and scaffolds; and secondly is able to drive." (R. 50-51).

There is no evidence in the record of a treating physician indicating that Plaintiff can do any of the additional limitations of the second hypothetical. And it is unclear on what basis the ALJ concluded that Plaintiff can perform "occasional bending, balancing, crawling, twisting, squatting, kneeling, and climbing with no climbing of ropes, ladders or scaffolds." (R. 15). The  relevance of the Claimant's

ability to occasionally bend, balance, crawl, twist, squat, kneel, and climb with no climbing of ropes, ladders or scaffolds, is unclear; however, since these are additional limitations which the Claimant does not have.  Since the vocational expert opined that an individual with Plaintiff's age, education, work experience, and RFC could perform work at a light exertion level, including her past work as a radiology technician, the ALJ's conclusion that Claimant can perform her past work is supported by substantial evidence on the record.

   Conclusion

        For the foregoing reasons, Plaintiff's Motion to Reverse the Commissioner's Decision (Dkt. No. 21) is DENIED and Defendant's Motion to Affirm the Decision of the Commissioner (Dkt. No. 26) is GRANTED.

                                    IT IS SO ORDERED.
                                                            Vanessa Bryant
                              *Vanessa Lynne Bryant*  2018.09.14 14:53:37
                                                            -04'00'
                              _____
                              **Hon. Vanessa L. Bryant**
                              **United States District Judge**


**Dated at Hartford, Connecticut: September 14, 2018**